IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
JUDGE WALKER D. MILLER

Civil Action No. 06-cv-00708-WDM-BNB

SHELIA MITCHELL,

    Plaintiff,

v.

QWEST COMMUNICATIONS INTERNATIONAL, INC.,

    Defendant.

## ORDER ON MOTION FOR SUMMARY JUDGMENT

Miller, J.

This matter is before me on the Motion for Summary Judgment (doc no 88) filed by Defendant Qwest Communications International, Inc. ("Qwest"). Plaintiff opposes the motion. Upon review of the parties' filings, I conclude oral argument is not required. For the reasons that follow, the motion will be granted.

### Background

This is an employment discrimination case pursuant to Title VII of the Civil Rights Act of 1964, as amended, Title I of the Civil Rights Act of 1991. Plaintiff contracted with Snelling Personnel Services in February 2004[1] to provide project manager services at Qwest, specifically in the retail Qwest Wireless organization.[2]

---

[1] Plaintiff had previously worked for Qwest and Qwest's predecessor for 15 years but left voluntarily in 2001.

[2] The facts set forth here are drawn from the parties' briefs and are undisputed unless otherwise noted.

Plaintiff and other project managers in her group were responsible for managing the launch of Qwest retail kiosks in malls across the country. It is undisputed that at the time that Plaintiff was hired there was some urgency in launching the kiosks and that their supervisors always wanted to know the reasons for any delays in a launch.

Plaintiff was interviewed and hired by Larry Luciano ("Luciano"), who was also her supervisor once she began her assignment at Qwest. On April 1, 2004, a few months after Plaintiff's contract began, she was on a work telephone call with Luciano and another contract project manager, Richard Herburger ("Herburger"). The following conversation was inadvertently recorded on Plaintiff's voice mail after she hung up from the call:

> Herburger: No, you want that nigger jive on right? Go ahead, turn it on!
>
> Luciano: It don't bother me man. No. That's Spencer's shit!
>
> Herburger: Oh yeah! He likes that?
>
> Luciano: Yeah! That's Spencer's shit. He's down with that Chingy or Chongy or whatever![3]

Plaintiff forwarded the message to Herburger and Luciano and expressed her disappointment over the behavior. Luciano left a message apologizing for the message and requesting to speak with Plaintiff in person about the incident. Herburger also left a message with Plaintiff requesting to talk with her. Both apologized in person. Plaintiff informed them that she intended to file an EEO complaint. Luciano said that he

---

[3] Qwest presents evidence that Luciano and Herburger were talking about a song on the radio.

2

understood and that she should do what she had to do.[4] He assured her she would suffer no retaliation for her complaint.

Shortly after the telephone incident, Plaintiff, Luciano and Herburger were on a business trip. Plaintiff wished to buy cigarettes and showed Herburger her brand; he responded, "I would have guessed you smoked Kools," which Plaintiff understood to be a racist stereotype. Luciano told Herburger to "stop it," which was apparently the end of the incident.

Plaintiff reported the voice mail to the Qwest Legal Affairs Hotline. A manager from the hotline contacted Luciano's supervisor, Cinira Baldi ("Baldi"). As a result, Luciano was reprimanded for failing to immediately address Herburger's inappropriate comment and was warned that further incidents would lead to Luciano's termination. Herburger was released from his contract a few months later. Qwest presents evidence that he was fired because of his inappropriate behavior with Plaintiff, but Plaintiff was told simply that Herburger was let go because he "wasn't working out." Plaintiff's contract was extended on May 26, 2004 to December 2004.

As a project manager, Plaintiff was responsible for managing the overall process of opening a retail kiosk from construction to opening. Project managers met regularly to discuss status of launches, and delays and reasons for delays were discussed and reported regularly. Plaintiff had regularly been praised and recognized by Luciano for launches that went well. However, in June 2004, two of Plaintiff's Iowa kiosk launches

---

[4] In her response brief, Plaintiff asserts that Luciano asked her not to report the incident, but Plaintiff's evidence does not support this allegation.

3

were delayed because of Plaintiff's failure to timely obtain building permits. Plaintiff contends that she did not know about the need for building permits until after the project was approved and worked hard to get the permits approved as quickly as possible. Luciano asked Plaintiff to document the reasons for the delay and her actions to resolve the problem. Qwest presented evidence, which Plaintiff does not rebut, that this was the first launch delayed by a building permit problem and that it was important to share the information to avoid the problem in the future.

Around the same time, Plaintiff was also asked to document problems concerning a delay in a delivery of home receptionist telephone equipment to a kiosk. Luciano had believed that Plaintiff was responsible for managing home receptionist orders for the entire team, but in fact Plaintiff had only stepped in to help a colleague with his launch and then encountered the equipment delivery problem. Plaintiff sent Luciano a memo documenting the issues and explaining that she was not responsible for ordering home receptionist equipment. Her memo also contained the following notes: "Again, I am submitting this memo per your request. This is the second time you have asked me to document an issue that I've been involved in. . . . I am not aware of anyone else having to document [launch delays] in writing or any other issue that has come up and certainly not when they were offering to help a situation. Is this the process that everyone follows when a mall launch is delayed? Documented in writing? . . . I have to tell you, I don't understand your reaction. I feel I am being singled out." Plaintiff also alleges that after her complaint, Luciano was "short" and "rude" with her, by cutting her off when she spoke in meetings, for example, or blaming her for things

that she believed were not her responsibility. Qwest has presented undisputed evidence that Luciano asked all project managers to put in writing issues as they arose.

Plaintiff met with Luciano's supervisor, Baldi, to discuss the possibility of moving away from Luciano. There was an attempt to move Plaintiff to another section supervised by Lori Trombetta. However, it was ultimately determined that Trombetta needed more assistance in merchandising, and that Plaintiff did not have the necessary experience. As a result, the transfer did not go through and Plaintiff stayed in Luciano's group.

On August 2 and 3, 2004, Plaintiff was responsible for the launch of a kiosk in the Jordan Creek Mall in Iowa. The mall was newly constructed and a large number of visitors were expected on opening day. According to Tonia Crotty ("Crotty"), another Qwest employee who was on site working on the kiosk, Plaintiff left the mall before the opening. Crotty sent an email to Baldi about the launch, as well as pictures of the kiosk which showed that the kiosk was not ready for opening when Plaintiff left. Crotty described the condition of the kiosk as "embarrassing" and stated that she and her father had had to ensure that the kiosk was presentable for the opening. She noted, "My dad had more ownership in this kiosk than the project manager and the individual merchandising this kiosk." Plaintiff disputes this and asserts that she performed satisfactorily. She contends she was not responsible for merchandising or staging. Nonetheless, she does not dispute that her supervisors received the email and does not believe that Crotty harbored any personal animus against her.

Just a few weeks later, around August 20, 2004, Plaintiff was involved in a site

visit for a launch at another mall, although she was not the project manager. Following that visit, both Luciano and another project manager requested information from her about the site. Plaintiff sent Luciano a memo demanding clarification about reporting structures. The letter began: "Can you help me understand why [coworker] calls me and asks me to give him a status on Southcenter and then you call me 15 minutes later and ask me the same questions? Do I report to [coworker] as well? Am I to take direction from him? If you have directed him to act as my supervisor, then I need to know. As far as I'm concerned, [coworker] is my peer." After receiving the memo, Luciano felt that Plaintiff's response was unnecessarily combative and confrontational. In light of the recent problems with mall launches, as well as feedback from other employees that Plaintiff was not a good "team player," Luciano and Baldi decided to end Plaintiff's contract. Plaintiff was informed of the termination of her contract as of August 23, 2004. Plaintiff then submitted a written internal complaint to Qwest's EEO group. The Law Department conducted an internal investigation and concluded that the April 1 voice mail incident constituted a violation of Qwest's non-discrimination policy, but that no violation of the non-retaliation policy had occurred. Plaintiff was informed of the results of the investigation. In the investigation, several employees in Plaintiff's group were interviewed; some of Plaintiff's coworkers noted that Luciano was sometimes impatient or moody with all employees but was generally fair and offered constructive feedback. Other information from Plaintiff's coworkers corroborated Luciano and Baldi's assessment of Plaintiff's problems with launches and communication and attitude issues (although opinions varied).

After exhausting her administrative remedies, Plaintiff filed this lawsuit. According to the Pretrial Order, filed September 17, 2007, she asserts the following claims for relief: (1) Retaliation in Violation of Title VII; and (2) Race Discrimination in Violation of Title VII.

## Standard of Review

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. A factual issue is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248 (1986).

Where "the moving party does not bear the ultimate burden of persuasion at trial, it may satisfy its burden at the summary judgment stage by identifying 'a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.'" *Bausman v. Interstate Brands Corp.*, 252 F.3d 1111, 1115 (10th Cir. 2001) (quoting *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)). Then, "[t]o avoid summary judgment, the nonmovant must establish, at a minimum, an inference of the presence of each element essential to the case." *Id.*

A plaintiff alleging employment discrimination may prove intentional discrimination by direct or indirect evidence. In the absence of direct evidence, the analysis set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-804 (1973), provides the framework for assessing indirect, or circumstantial, evidence. *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1226 (10th Cir. 2000). Under this

analysis, the plaintiff bears the initial burden of presenting a *prima facie* case of discrimination. *Kendrick,* 220 F.3d at 1226. If the plaintiff establishes a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason" for its action. *Id.* at 1226 (quoting *McDonnell Douglas,* 411 U.S. at 802). If the defendant presents such a reason, the plaintiff bears the "ultimate burden" of establishing that these proffered reasons are a pretext for unlawful discrimination. *Munoz v. St. Mary-Corwin Hosp.,* 221 F.3d 1160, 1167 (10th Cir. 2000).

The plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy or credence and hence that the employer did not act for the asserted non-discriminatory reasons." *Jaramillo v. Colorado Judicial Dept.,* 427 F.3d 1303, 1308 (10th Cir. 2005); *see also Kendrick,* 220 F.3d at 1230 (three ways of showing pretext are: (1) evidence that the defendant's stated reason for the adverse action was false; (2) evidence that the defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or (3) evidence that defendant acted contrary to an unwritten policy or practice when making the adverse decision).

The burden shifting approach also applies to a claim of retaliation. To establish a *prima facie* claim under Title VII for retaliation, a plaintiff must establish three elements: (1) the plaintiff engaged in protected opposition to discrimination; (2) a reasonable employee would have found the challenged action materially adverse; and

(3) a causal connection exists between the protected activity and the materially adverse action. *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1202 (10th Cir. 2006) (citing *Burlington Northern & Santa Fe Ry. Co. v. White*, ---U.S. ----, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006)).

## Discussion

1. Retaliation

Qwest argues that Plaintiff cannot establish a *prima facie* case of retaliation because there is no causal connection between her protected activity and any material adverse action. Moreover, Qwest asserts, even if Plaintiff satisfies her *prima facie* burden, she cannot show that Qwest's nondiscriminatory reasons for its actions are pretext for retaliation.

As part of her *prima facie* case, Plaintiff must establish that she suffered a material adverse employment action, defined as an injury or harm that "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern*, 126 S. Ct. at 2415. The particular circumstances surrounding the act also should be considered in determining the impact of an employer's act. *Id.* Plaintiff argues that Luciano's treatment of her after her complaint was retaliatory, as was the decision to terminate her employment.

I agree with Qwest that Luciano's alleged attitude and "nitpicking" of Plaintiff's work do not constitute materially adverse employment actions. The materiality of a claimed adverse action is to be determined objectively; "petty slights, minor annoyances, and simple lack of good manners" will not deter a reasonable worker from

9

making or supporting a charge of discrimination. *Burlington Northern,* 126 S.Ct. at 2415. Luciano's alleged shortness and rudeness clearly fall into this category, particularly in light of the lack of specificity in Plaintiff's allegations.[5] Plaintiff seems to have been quite offended at having to put in writing the problems that occurred on launches, but does not deny that it was important for management to know about delays and the reasons for them. Moreover, the requests to document issues do not appear to be disciplinary and had no effect on Plaintiff's pay or status. As an objective matter, I cannot conclude that a reasonable jury would consider such conduct to be materially adverse, particularly since it was in response to real issues and justified by legitimate business concerns. *Cf. McGowan v. City of Eufala,* 472 F.3d 736, 743 (10th Cir. 2006) (to establish a retaliation claim under Title VII based on a hostile work environment, the behavior complained of must render the workplace permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment).

The termination of Plaintiff's employment, on the other hand, is clearly a materially adverse action. The question, then, is whether Plaintiff's evidence demonstrates that it was causally connected to her complaint. Defendant contends that it was not, as there was no close temporal proximity and no other evidence suggestive

---

[5]In her deposition, Plaintiff gave a few concrete examples of the alleged retaliatory behavior, which included Luciano cutting her off when she spoke in meetings, giving her a flippant response to a question about timekeeping, and indicating in meetings that she had not given him information when in fact she had.

of causation. Unless there is very close temporal proximity between the protected activity and the retaliatory conduct, the employee must offer additional evidence to establish causation in order to prove a *prima facie* claim of Title VII retaliation. *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1182 (10th Cir. 2006); *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999) (three month interval between protected activity and adverse action, standing alone, is insufficient to show causation). Here, the four months between Plaintiff's initial complaint and her ultimate termination is not suggestive of a causal connection between the two events. Moreover, Plaintiff's contract was extended in May 2004 (to run until December), approximately a month and a half after the complaint, which suggests that Luciano wanted to continue working with Plaintiff.

Plaintiff asserts that causation is shown because Luciano asked Plaintiff not to report the incident (an allegation that is not supported by the evidence), because of his attitude and behavior after the complaint, and because he fired Plaintiff. I disagree that this establishes causation. Plaintiff is somewhat vague about the alleged retaliatory pattern of behavior by Luciano, which she describes in her deposition as "attitude," "little nicks and digs," and "convenient misunderstandings." Plaintiff's concrete examples, as discussed above, clearly fall into the realm of "petty slights" and are not strongly suggestive of a retaliatory motivation, particularly in light of evidence on the record that Luciano could be somewhat volatile with all employees. In addition to the lack of temporal proximity and lack of evidence supporting Plaintiff's assertions, the inference of causation is further diminished because the decision to terminate Plaintiff's

employment was also made by Baldi, who was the one who had imposed discipline on Luciano for the voice mail incident and who sought to assist placing Plaintiff in another position.

Moreover, even if Plaintiff establishes a *prima facie* case, no reasonable jury could find that Qwest's nondiscriminatory and nonretaliatory reasons for terminating her employment are pretextual. Plaintiff presents evidence that another coworker believed Plaintiff had been a "scapegoat" for the problems with an unrelated project and that Plaintiff believed the problems with the launches were not her fault; however, there is also evidence from other employees that are consistent with the reasons for the termination. She also argues that she was given inconsistent reasons for the decision not to transfer her to Trombetta's group after preparing to do so. The last allegation is not supported by the evidence; Plaintiff alleged in her charge of discrimination the same reason for the decision not to transfer that Qwest now offers.[6]

It is well-established in this circuit that "'[t]he relevant inquiry is not whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs." *Rivera v. City and County of Denver*, 365 F.3d 912, 924-25 (10th Cir. 2004) (internal quotation marks and alteration omitted); *see also Kendrick*, 220 F.3d at 1231 ("[A] challenge of pretext requires us to

---

[6]Although this argument is not expressly made, Plaintiff appears to allege that she was not given the opportunity to interview for two full-time (i.e., not contractor) project manager positions at Qwest. However, it is undisputed that Plaintiff never applied for these positions, which were advertised internally and externally. An employee must apply for a position to state a claim for retaliatory failure to promote. *Mickelson v. New York Life Ins. Co.*, 460 F.3d 1304, 1318 (10th Cir. 2006)

look at the facts as they appear to the person making the decision to terminate plaintiff."). Thus, even if the stated reasons later prove to be incorrect, I must examine whether the employer believed those reasons and made a good faith decision at the time of the discharge. "The reason for this rule is plain: our role is to prevent intentional discriminatory hiring practices, not to act as a 'super personnel department,' second guessing employers' honestly held (even if erroneous) business judgments." *Young v. Dillon Comp.*, 468 F.3d 1243, 1250 (10th Cir. 2006) (citations omitted).

Here, there is no dispute that Plaintiff was responsible for obtaining proper building permits and that no other launch had been delayed for this reason before. In addition, it is undisputed that Plaintiff was responsible for ensuring that kiosks were ready to be opened and that her supervisors had good reason to think she had failed to do so in one instance. Finally, Plaintiff's correspondence does indicate that she challenged and complained about legitimate requests for information from her supervisor and coworkers. Qwest's internal investigation into Plaintiff's allegations also revealed that several of Plaintiff's coworkers found her to be defensive and that Luciano was a fair manager, albeit sometimes unpredictable. Plaintiff does not identify any other coworker that had the same number and quality of problems with launches or attitude issues who was treated differently. Plaintiff's difference of opinion about responsibilities or her performance are insufficient to create issues of fact as to whether Luciano and Baldi honestly believed in good faith that termination was justified for legitimate reasons. I simply cannot conclude that a reasonable jury could find, in light of the significant evidence supporting the decision, that the proffered reasons for

13

Plaintiff's termination are implausible or *post hoc* efforts to conceal retaliation. Accordingly, summary judgment should enter in favor of Qwest on this claim.

2.   Discrimination

Qwest also argues that Plaintiff cannot establish a *prima facie* case of race discrimination or demonstrate pretext. It is undisputed that the only overtly racial comments were made by Herburger, another contractor who was thereafter released, and that no similar comments were made by Luciano or any other Qwest employee. This evidence, standing alone, is insufficient for a reasonable jury to conclude that Plaintiff's discharge was because of unlawful discrimination.

Defendant urges me to adopt a "same actor" inference, noting that Luciano, who made the decision to hire Plaintiff, also was involved in the decision to terminate Plaintiff's employment. *See Antonio*, 458 F.3d at 1183 (where employee was hired and fired by the same actor within a relatively short time span, there is a strong inference that the employer's stated reason for acting against the employee is not pretextual). Qwest is entitled to this inference in these circumstances, although the inference may be somewhat weakened here. As Plaintiff notes, Luciano did not immediately admonish Herburger for his comment but rather continued with the conversation. Nonetheless, there is no evidence of discriminatory conduct or animus by Luciano and significant evidence that he apologized several times and sought to remedy the situation caused by Herburger. In addition, the undisputed evidence is that Qwest responded to the situation quickly and imposed appropriate discipline.

The offensive comment was a single incident months before the decision to

14

release Plaintiff and was made by a person with no role, or even employment, at Qwest at the time of the termination. This is insufficient to tie the comment to the employment decision. Finally, as discussed above, Plaintiff's evidence does not demonstrate pretext.

In response, Plaintiff argues that "her supervisor" laughed about the use of the offensive term, joked about it, engaged in racial stereotypes, treated her differently because of her race, forced her to travel with Herburger, failed to fire Herburger, and failed to pay her the same hours as her coworkers (an allegation apparently now dropped). Plaintiff's evidence does not support most of these assertions. *Bones v. Honeywell Intern., Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) ("Unsubstantiated allegations carry no probative weight in summary judgment proceedings.") (citations omitted). The only allegation that is supported by evidence is that Plaintiff had to go on a business trip with Luciano and Herburger shortly after the voice mail incident. According to contemporaneous notes written by Plaintiff, this occurred after extensive discussion between the three about the voice mail message and after Plaintiff had assured Luciano she was comfortable about going on the trip. It appears that Luciano tried to put Herburger and Plaintiff on separate sites during the trip but was unable to do so. Moreover, although Qwest did not immediately terminate Herburger's employment, this cannot be construed as condoning his conduct in light of the other discipline and reprimands imposed (and since he was ultimately release from his contract). None of Plaintiff's evidence supports an inference of discriminatory animus or indicates that the reasons given for Plaintiff's termination were not genuine or in

15

good faith.

Accordingly, it is ordered:

1. Qwest's Motion for Summary Judgment (doc no 88) is granted. Judgment shall enter in favor of Defendant and against Plaintiff and the case is dismissed with prejudice.

2. Qwest may have its costs.

DATED at Denver, Colorado, on December 4, 2007.

BY THE COURT:

s/ Walker D. Miller
United States District Judge